Good morning, Your Honors. May it please the Court, my name is Elizabeth Krusek and I'm appearing on behalf of Ms. Paula Anthony. I will watch the clock and try to reserve two minutes for rebuttal. I will start, given the Court's order on Sexton and the 28J letters, I will start with the forfeiture issue. So we've reached the point, both parties agree that Honeycutt applies to forfeiture orders under 981. I believe that for the reason set forth both by the government in its 28J letter and in my 28J letter, that that is the correct legal position and I'm happy to answer any questions about the applicability of Sexton if the Court wishes to ask more questions given the government's position. I think I may have more questions for the government on that than for you. I think I understand your argument on that. One question I did have is that let's assume, and this isn't just an assumption, let's assume that Honeycutt applies to this statute. As I understand the facts in this case, your client is, again, you may be contesting guilt, but the facts here that the funds were deposited into her account, the funds, she then removed the funds from the account and then wired them overseas. That is correct. Yeah, the checks were made out to her, they were deposited into her account and then she withdrew the cash. There's no dispute about those facts. All right, so if those are the facts, I've read Honeycutt a bunch of times and it seems like there are a couple of different things going on in that case. The government might say, well, look, she clearly had possession or she actually acquired, she actually acquired the funds. They were actually deposited into her account. That's one way you could read Honeycutt. There's another way you could read Honeycutt which talks about an ownership interest. And I assume you would say in your case your client never had an ownership interest because she was basically a bag man. Correct. Yes, so my position is that my client is analogous to the college student that Honeycutt uses as an example for why we don't have joint and several liability. I understand that there's some sort of pull to the fact that, well, the checks were issued to her and they went into her account. But if you really think about it, that doesn't make her any different than the college student who gets, say, cash payments for drugs. The college student could be issued a check, he's paid the check, he turns it over to the mastermind. That still makes you a pass-through and the money was never hers. Now, I agree that she did obtain a portion, it's somewhere between five and ten percent that she saved. That's proceeds that she obtained. But the proceeds were actually obtained and that's what Honeycutt really focuses on. The proceeds were obtained by these other co-conspirators in Nigeria and elsewhere to whom she passed them along. So she really is like this college student who is receiving the money and the money is flowing through her, but it's never her intent to have it. She never actually obtains it or acquires it within the meaning of Honeycutt because the people who actually obtain are sort of obtaining indirectly through her are those people in Nigeria. I guess that's why Honeycutt to me is so confusing because I think it's fair to say she acquired it, but you're arguing, and there's language to support your argument, that she did not actually have an ownership interest in it. She did not. No, it was never her property. The only thing in which she had an ownership interest would be the fees that she was paid. She didn't have an, you know, that's the only, I don't even want to use the word ownership interest. She had an interest to the extent that she took a fee from this money. No, no, I thought, Your position I think is very clear. What's not clear to me is what the Supreme Court meant to do in Honeycutt. So do you have any case law post-Honeycutt, not talking about the applicability of the statute, I mean that, we'll assume that for now, but that actually applies Honeycutt to situations like this? I don't. It's not a well-developed area of law because it's so recent, so I don't. I, you know, I really, to me, the best analogy that I have is the college student as a pass-through. I think that that fits this situation, and I think that that would be fair to Ms. Anthony under the basic criminal forfeiture principles that criminal forfeiture is aimed only at a defendant's interest in property, and her only interest was in those fees that she actually obtained. Let me ask you a question. Go ahead. If I read the hypothetical in Honeycutt to not say that the student actually obtained any money, that she was delivering packages and got a $300 a month fee from the farmer who was doing the marijuana, is there anything that you recall in the Honeycutt hypothetical that said she actually received any of the proceeds from the individual people she was delivering these packages for? So the Honeycutt hypothetical was sort of two-pronged. There was one prong in which it talked about simply the pass-through delivering the drugs, but there was another one in which it talked about indirect obtaining of proceeds, and in that hypothetical the court said that the college student could receive payment for the drugs and then pass that payment along to the mastermind, and even if the college student was paid a small fee for that, the college student would only be on the hook for the fee that was paid and not for the entire proceeds that went through the college student. So it was sort of a variation on their initial hypothetical, but that is in the Honeycutt decision. The IRS here put the money directly into her several checking accounts. Is that what happened? There are a couple of different things. What's at issue here are checks that were issued to her by the Green Dot Corporation. So the IRS loaded refunds onto Green Dot accounts. Green Dot accounts, checks were cut from those accounts and then mailed to her, and she deposited them. Was she the owner of the Green Dot accounts? The Green Dot account, no. The Green Dot accounts were set up in the names of the people who would receive the IRS tax refunds. They're fake. They were real people, but yes, they did not set up their own Green Dot accounts. So they were held by those individuals. Those accounts were set up by Mr. Coleman or his co-conspirators, not my client. And then someone, also not my client, cut checks, made payable to and mailed to my client from those Green Dot accounts. She took those checks and put them in her account? She did, yes. And then she dispersed the funds from there? Correct, yes. And so my position, again, just to be clear, is that she is analogous to this is thin on this issue, but I think that that is the best analogy. I would like to talk briefly about the constructive amendment issues as well, unless the Court has additional questions about forfeiture. I'll talk about the money laundering count. Here, I think it's clear that there was, and the government concedes that there was an error in the instruction. The question, I think, is whether there was evidence. What the government disputes is whether there was really evidence to convict Ms. Anthony such that this constituted a constructive amendment of the indictment. I believe that there was sufficient evidence that a jury could have considered to convict her under this theory, and therefore there was a constructive amendment, and this count should be reversed. The government presented evidence that Ms. Anthony used multiple bank accounts, multiple accounts in those banks, that she wired money and then took steps to get the evidence, and all of those requirements would have been linked to financial regulations and rules about reporting transactions and reporting activity. When you look at the evidence, that evidence could have easily supported, given the general jury instruction, a conviction based on the unindicted and uncharged conduct of structuring money laundering. I do see that I have only about two minutes remaining, so I would reserve the rest of my time. Okay. That's fine. Good morning. May it please the Court. My name is Monica Adelstein, and I'm an assistant United States attorney from the District of Arizona. I was trial counsel in this matter. Could you keep your voice up? Yes, sir. Yes, Your Honor. Turning first to the Honeycutt issue, I believe the Court may have some questions on that. The United States' position on this is that, simply stated, Ms. Anthony is a farmer in the example. She is not the student driver. The order that the Court issued with regard to the forfeiture was directly tied to proceeds that she possessed directly. The $312,000-plus were funds that she had, were mailed to her through the Green Dot checks that she transacted through her own bank accounts and that she then directed others or herself wired a portion of those funds to Nigeria. She sort of cultivated the dollars. Yes, Judge. Essentially what it was is that this is an individual who was a principal in this scheme. The facts of this case were that the Green Dot cards that were originally purchased, many of those were purchased directly by Ms. Anthony in the United States. She provided that source information to her co-Federates, who then were able to open the Green Dot cards and direct the IRS refunds into those, onto those cards. But for Ms. Anthony, the proceeds in this case, the illegally obtained proceeds, would have remained nothing more than a wire transfer from the IRS to the Green Dot company, and from the Green Dot company they would have just sat in those accounts. But the facts are that checks were issued in Ms. Anthony's name. She received those checks to her mailing address. She received those checks to a P.O. box that she controlled, and that with respect to the entire $312,000-plus amount, she individually transacted those through numerous bank accounts that she held in her name or in her business's name. So but for Ms. Anthony's active principal role in this scheme, there would have been no proceeds with which to transact. The evidence further shows that she did retain a portion of these proceeds. She did utilize them personally to make personal purchases. And she did also make the decision when and how these would be wired to Nigeria with the instructions that she and her co-Federate worked out together via e-mail, the large number of correspondence that they had back and forth. Can I ask you, counsel, and again, I had your job once upon a time, so if this is Washington, D.C. telling you to argue a certain position, then you can just tell me that. I'm trying to understand why the government would concede that Honeycutt applies to 981A1C. I believe the Sixth Circuit, we have someone from that court right now here, disagrees with that, and it would seem to me that the Sixth Circuit has a pretty good argument as to why it wouldn't apply, and that seems to be against the position. So if your position is that's what DOJ is telling me to argue, then okay. But if you have something better than that, help me out here. Judge Jones, the United States does believe that the outcome in the Sexton case, the forfeiture order, was a correct order, but the Department would reach that decision based on a different reasoning. And the Department has taken the position that Honeycutt does apply to the forfeiture statute, the 981A statute as well, and so argued in the petition for cert with respect to Sexton, arguing in opposition to that. So the Department does take the position that Honeycutt applies to the forfeiture statutes, including 981A. And so if we were to get from your view, we may have to write an opinion in this case. So normally we would want to say more than the Department says that it is, so that's the way it is. Is there something in some pleading somewhere, or you mentioned the cert petition, that really lays out why? Because I'm just looking at the language here in 981, and it's very different than the language in 853. So is there something in the language on 981? I know it's a little awkward for you because you're arguing the position of the other side, but is there something in the language in the statute I'm missing here? Well, Judge, there really is no need to decide specifically whether Honeycutt applies to the 981 statutes because of the factual scenario before the court. No, I appreciate that. What you're arguing is that, look, you can assume it applies, you don't have to decide because she was the farmer. Correct. There is ample evidence with respect to her actual possession and transactions. So with respect to trying to look at it from a Honeycutt perspective, whether it applies or not, she has the requisite control and possession. But since you've thought about this, just, and again, that's the last time I'm going to ask, is there anything in the statute that you can point us to, to say, hey, hey, Judge Gilman, get that Sixth Circuit in line over there. They don't know what they're talking about. Is there anything in the statute that could help us there? Specifically, the difference in the statute is the connected to the crime versus the Sexton ruling, which the Sexton ruling was that it's connected to the crime, whereas the Honeycutt standard is obtained. There is some distinct similarities between those two phrasing, enough so that when you're looking at it in the context of the case, it is we're talking about proceeds that are subject to forfeiture connected to the crime can be analogous to obtained in the context of that. Well, I think you've done a very good job of defending the Department's position here. I won't push any more. With respect to the constructive amendment issue, the United States does agree with respect to Count 14 that there was an error. However, the United States takes the position that there was absolutely no prejudice as a result of this error. There is both an omission and an inclusion. The included language was with respect to this idea of a structuring theory or a avoiding a transactional report. The evidence at trial is simply that there was no mention of CTRs. There was no mention of the word structuring. It wasn't argued by counsel. There were no witnesses to that. In contrast to that, the omitted prong of the international money laundering actually took two of the three days of trial. All of the evidence was focused on that. And to the great detriment of the government, that particular way of committing this crime was omitted from the final jury instructions. So to the extent that the prejudice in this case clearly from the record was to the government rather than to the defendant, the government believes that there is no prejudicial variance justifying reversal. And what would be the practical effect? And let's say we were to agree that there was plain error here on these counts, just to understand how the sentence, so it would be sent back to resentencing. She still was convicted on a lot of stuff, right? Every account, yes, Your Honor. And so would the base offense level change at sentencing because it's money laundering versus the wire fraud? Or would this basically just be a redo so you get the special assessments back and it would be done? Yes, exactly, precisely. The total guideline range would not change based on the loss amount. There were two conspiracies. This was the second conspiracy. And there's absolutely no, nothing on the record of the jury instructions that supports that any variance of any kind occurred with respect to count one. And there's not the plus two? Sometimes for money laundering there's a plus two when it's in conjunction with mail fraud under the guidelines. Would that maybe be one difference? Potentially, but it would not ultimately, that would not ultimately have changed her guideline range, the consideration the court would have had. And she did actually receive a below guideline sentence. If there are no additional questions. Okay. Thank you. Thank you. Thank you. So just to address the last point first, Ms. Anthony did receive the plus two enhancement under the money laundering. So I do think there is the potential for a different base offense level. I do acknowledge she did receive a downward variance, but nevertheless that was based on a particular guidelines calculation. With respect to factual disputes, the government has consistently portrayed my client as sort of a mastermind. And I would just like to take an opportunity to point out that she was consistently acting at the direction of this Mr. Coleman or whoever it was in Nigeria. She did not formulate this offense. She didn't do anything to obtain the identities of the people whose tax refunds were stolen and filed. She obtained the green dot cards at his direction. She directed the money via wire at his direction. So she was always acting at his direction. So if we're going to make an analogy to, you know, the farmer versus the college student, the IRS expertise, she, I don't know what Mr. Coleman's expertise was quite frankly, she was a tax preparer and she testified as, as such, she acknowledged that she was. But nevertheless, she was still, she did not formulate the scheme and she did not she was not in charge of anything other than she just received the checks and wired them as Mr. Coleman directed. And so our position is that makes her not a principal, not the farmer, but the college student. And then with respect to the constructive amendment claim, I would just point out that simply because structuring wasn't mentioned or simply because a cash transaction amount or something like that, that we all know would be structuring wasn't mentioned. It doesn't mean that the jury couldn't have decided based on the evidence presented and the limited definitions in the jury instruction that they could convict her on that because there was sufficient evidence. And real quick, before I forget, the parties agreed that we need to remand to fix one of those conditions. Correct. Yes. The supervised release condition. Yes. Okay. Thank you. Thank you very much. Thank you. Counsel matters submitted at this time.
judges: Gilman, Paez, Owens